1  Michael H. Artan (State Bar No. 97393)
   One Wilshire Boulevard, Suite 2200
2  Los Angeles, California 90017
   Tele: 213/688-0370 Fax: 213/627-9201
3  Email: michaelartan@yahoo.com

4  Ambrosio E. Rodriguez
   626 Wilshire Boulevard, Suite 460
5  Los Angeles, CA 90017
   Telephone: 213-995-6767
6  Email: aer@aerlawgroup.com

7

8  Attorneys for Plaintiff
   **DORRELL SLAUGHTER**

9
           **UNITED STATES DISTRICT COURT**
10
           **CENTRAL DISTRICT OF CALIFORNIA**
11
   DORRELL SLAUGHTER, an          )   CASE NO.: 2:20-CV-00393-PSG-JPR
12 individual,                    )   *[Assigned to Judge Philip S. Gutierrez,*
                                  )   *Courtroom 6A]*
13            Plaintiff,          )
                                  )
14                               )   PLAINTIFF'S EXHIBITS IN SUPPORT
   vs.                            )   OF CONTROVERTED FACTS &
15                               )   DECLARATION OF AMBROSIO E.
                                  )   RODRIGUEZ
16 DEPUTY S. FERNANDEZ, an       )
   individual and Deputy of the Los )
17 Angeles Sheriff's Department;  )   *[Compendium of Evidence in Opposition*
   DEPUTY J. SANDOVAL, , an       )   *of Summary Judgment Filed Concurrently*
18 individual and Deputy of the Los )  *Herewith]*
   Angeles Sheriff's Department;  )
19                               )
   DEPUTY C. ADAMS, an individual )   Complaint Filed:    01/14/2020
20 and Deputy of the Los Angeles   )   Pretrial Conference: 08/23/2021
   Sheriff's Department; DEPUTY J. )   Trial Date:          09/07/2021
21 FERNANDEZ, an individual and    )
   Deputy of the Los Angeles Sheriff's )  Hearing Date:   August 6, 2021
22 Department; COUNTY OF LOS      )   Time:               1:30 p.m.
   ANGELES, a public entity; and   )   Courtroom:          6A
23 DOES 1 to 20,                  )
              Defendants.         )
24                               )
25                               )
                                  )
26

27

28 22325

                                  1
   **PLAINTIFF'S EXHIBITS IN SUPPORT OF CONTROVERTED FACTS &**
        **DECLARATION OF AMBROSIO E. RODRIGUEZ**

## DECLARATION OF AMBROSIO E. RODRIGUEZ

I, Ambrosio E. Rodriguez, declare as follows:

1.      I am an attorney duly licensed to practice law in California. I represent Dorrell Slaughter in the case of <u>Dorrell Slaughter v. Deputy S. Fernandez, et. al.</u> case number 2:20-CV-00393-PSG-JPR.

2.      Attached hereto as **Exhibit A** is a true copy of the deposition of Los Angeles County Sheriff Deputy C. Adams, pages 7-10, and 24-28.  These pages are referenced in Controverted Facts number 8 and 31.

3.      Attached hereto as **Exhibit B** is a true copy of the deposition of Los Angeles County Sheriff Detective J. Sandoval, pages 35, 36, 38, 39, 46-48, 62-63, and 70-72. These pages are referenced in Controverted Facts number 12-14, 16, 17, 19, 20, 22, 39, 46-48, and 50.

4.      Attached hereto as **Exhibit C** is a true copy of the deposition of  Los Angeles County Sheriff Detective J. Fernandez, pages 17, 18, and 24-26. These pages are referenced in Controverted Facts number 12-14, 16, 17, 19, 33, 34,37, and 47.

5.      Attached hereto as **Exhibit D** is a true copy of the deposition of Mr. Dorrell Slaughter, pages 56 and 57. These pages are referenced in Controverted Facts 14, 21, 30, and 50.

I declare and affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on July 19, 2021, at Los Angeles, California

By: _____
Ambrosio E. Rodriguez
Attorneys for Plaintiff
Dorrell Slaughter

22325

2

# EXHIBIT  A

1          Do you remember that?

2     A     Yes.

3     Q     Could you tell us what assignment you were on

4  at the time Mr. Slaughter was arrested?

5     A     I was working in the field as a patrol trainee.

6     Q     I assume when you say patrol you were on patrol

7  in a marked vehicle.  Is that correct?

8     A     Yes.

9     Q     Were you partnered with someone?

10    A     Yes.

11    Q     Who was that?

12    A     Deputy Sandoval Mendoza.

13    Q     Could you tell us how it was that you first

14 became aware of Mr. Slaughter?

15    A     Yes.  We were responding to a separate call on

16 Central, just south of Alondra.  My training officer,

17 Deputy Sandoval Mendoza, made me aware that

18 Mr. Slaughter, who he recognized from a Be on the Lookout

19 poster, was, he believed, across the street.  So that's

20 how we became aware of him.

21    Q     Let me break this down, if you don't mind.

22          So at the time you were doing what you just

23 described, were you in your vehicle with your training

24 officer?

25    A     I was outside the vehicle.

7

1      Q     So presumably you were parked.

2            Is that correct?

3      A     Yes.

4      Q     So maybe you said this but where were you

5  parked?

6      A     We were parked in the shopping center of 906

7  South Central.

8      Q     I'm going to ask a favor of you, because it's

9  kind of hard with Zoom to know what people are doing.

10           If you're referring to a report, could you let

11  us know that you're doing that and we would just ask to

12  be aware of whether you're looking at a report when you

13  give us certain information.  Can you do that?

14     A     Yes.

15     Q     So that reminds me of a separate question.

16           In preparation for this deposition today did

17  you review any materials?

18     A     Yes.

19     Q     What did you review?

20     A     I reviewed the report I provided with the

21  arrest and the paperwork that went with it, as well as

22  the Be on the Lookout poster.

23     Q     When you say the paperwork that went with it,

24  what paperwork was that?

25     A     The booking slip.

8

1    Q    So let's go back to, you're standing by your

2  patrol vehicle, was your training officer also outside

3  the vehicle with you?

4    A    He was -- he was outside the vehicle.  He was

5  also inside the vehicle and he was walking around the

6  area while I was handling the initial call.

7    Q    Could you let us know, again, what it is you

8  were doing while you were parked there?

9    A    We were parked there to handle a separate call

10  for service at 906 South Central Avenue.

11    Q    Do you remember what that call for service was

12  about?

13    A    I do not.

14    Q    So if I'm understanding you, you and your

15  training officer were outside your patrol vehicle in the

16  process of taking care of another call and your training

17  officer saw Mr. Slaughter.  Is that correct?

18    A    Yes.

19    Q    Where was Mr. Slaughter at the time this

20  happened?

21    A    I don't know where my training officer

22  initially saw Mr. Slaughter.

23    Q    So when did he tell you that he recognized

24  Mr. Slaughter?

25    A    He told me to drive the vehicle to the west

9

1  side of the street, to the west side of Central, because

2  he believed he found the man from our Be on the Lookout

3  poster.

4      Q    Sorry, I'm taking a moment here.  I'm trying to

5  put together in my mind what you said.

6           So you're both outside the vehicle and at some

7  point your training officer tells you that he thinks he

8  saw Mr. Slaughter.  Correct?

9      A    Yes.

10     Q    Now, this Special Bulletin, the Be on the

11 Lookout bulletin, is that something you had seen, also?

12     A    Yes.

13     Q    So how long were you out of your vehicle when

14 your training officer said this to you?

15     A    I don't remember how long.

16     Q    Let's do it differently.

17          Can you just maybe walk us through what

18 happened in terms of your approaching the location where

19 you were going to provide service?

20     A    Well, we had already arrived on the location

21 and I don't recall specific details but I remember I was

22 detaining several people.

23     Q    So you'd arrived at that location to handle a

24 matter and you had already begun to detain other people

25 that are unrelated to Mr. Slaughter.  Correct?

10

1  informed him of what was happening.

2      Q    Do you have any knowledge as to what happened

3  with respect to his vehicle?

4      A    Yes.

5      Q    What was that?

6      A    His -- the woman who identified herself as his

7  wife, that he also identified as his wife, took custody

8  of the vehicle.

9      Q    In the time period between the time

10  Mr. Slaughter was initially put in the backseat of your

11  car until the time that his wife came -- it was a Jaguar.

12          Correct?

13      A    Yes.

14      Q    Was the Jaguar searched at all?

15      A    I don't remember.

16      Q    So you don't remember if it was searched at

17  all.  Is that correct?

18      A    Correct.

19      Q    So let's get back to the station.

20          You're in the parking lot, he's in the

21  backseat, he's outside the vehicle, then he's back in the

22  backseat and we don't know how long that whole period of

23  time transpired.  Correct?

24      A    Correct.

25      Q    And then you and Deputy Sandoval Mendoza arrest

24

**Ron Fernicola & Associates**

1   Mr. Slaughter for a 211, which is a robbery.  Correct?

2        A    Correct.

3        Q    What caused you, personally, to arrest him?

4             Let me put it this way.  Did Deputy Sandoval

5   Mendoza say:  We're going to arrest him for a 211; or is

6   this something that you independently from a different

7   source heard about?

8        A    I was told by Deputy Sandoval Mendoza that

9   we're going to arrest Mr. Slaughter for 211 PC.

10       Q    Can you estimate, to the best of your ability

11  give an estimate of the time period from the time you

12  arrive at the station with Mr. Slaughterer to the time

13  you're informed that he's going to be arrested, was it 15

14  minutes?  Two hours?  Can you give us an estimate?

15       A    I know it was over one hour but I don't know

16  how much longer it was beyond that.

17       Q    Do you have any idea why he was just sitting in

18  the backseat for at least an hour?

19       A    I do not.

20       Q    At some point did you ask Deputy Sandoval

21  Mendoza, what are we doing with him?  Why is he still in

22  the backseat?  Was there any discussion like that?

23       A    No.

24       Q    Did you have any idea why he might be sitting

25  in the backseat for so long at the station?

25

1      A     No.

2      Q     Would you agree with me that the normal

3  protocol would be to take him into the station to be

4  booked or interviewed or let go?  He wouldn't just be

5  sitting in the backseat of a police vehicle at the

6  station?

7      MR. PARKER:  Objection.  That lacks foundation.

8           You can answer the question, if you understand.

9      THE WITNESS:  I wouldn't necessarily agree with

10  that.

11      Q     BY MR. ARTAN:  Do you know of any other

12  situation where you brought someone in on a warrant and

13  basically they were sitting in a vehicle for about an

14  hour before anything was done with them?

15      A     Not specifically that I can think of at this

16  time.

17      Q     Can you think of any situation where there

18  would have been a reason to do that?

19      A     Yes.

20      Q     What reason comes to mind?

21      A     If you're wait -- say you're waiting for

22  another handling unit to come take control over the

23  arrestee.

24      Q     And that can take as much as an hour?

25      A     It could.

26

**Ron Fernicola & Associates**

1       Q       Did another handling unit come and take

2    Mr. Slaughter?

3       A       No.

4       Q       So that's not the reason why he was there for

5    that period.

6               Can you think of any other reason why he was in

7    the back of the vehicle are for that extended time?

8       A       I don't know why he was in the back of the

9    vehicle for that extended period of time.

10      Q       Can you walk me through what happened when he

11   was notified of his arrest and actually arrested; tell me

12   what happened.

13      A       He was driven to Century Regional Detention

14   Facility where we booked him for the charges.

15      Q       So you were first at Compton Station and then

16   you drove to Century.  Is that right?

17      A       Yes.

18      Q       So he was in the backseat at the Compton

19   Station and then you drove him to Century.

20              Is that right?

21      A       Yes.

22      Q       At Century what happened?

23      A       He was booked for the indicated charges --

24   charge.

25      Q       Being the robbery or the warrant?

                                                        27

1      A     For the 211 PC, the robbery.

2      Q     Can you estimate what time of night it was that

3  you got to Century?

4      A     After 2:00 a.m.

5      Q     When you got to Century, what did you do next

6  with respect to Mr. Slaughter?

7      A     I booked him for the 211 PC charge.

8      Q     Pretend I've never heard of any of these

9  things.  So walk me through a little slower.

10          You took him out of the vehicle, you walked him

11  to a particular location?  Explain that.

12     A     I escorted him out of the vehicle.  We walked

13  into Century booking area.  He answered some questions

14  from the custody assistants working the area.

15          I took him to a cell.  I searched him,

16  collected any property he might have had on him.

17          I completed the booking paperwork and turned in

18  the booking paperwork to the staff working the booking

19  counter.

20     Q     So after that did you have any involvement

21  regarding Mr. Slaughter's case?

22     A     No.

23     Q     Did you eventually hear that he got released?

24     A     Eventually, yes.

25     Q     What is it you heard in that regard?

28

**Ron Fernicola & Associates**

# EXHIBIT  B

1          Before I show you those pictures, I have to

2     read you this form or you have to read the form yourself.

3          I believe he read the form himself that day.

4          After he reads the form, I asked him, do you

5     understand?  He said, "yes" to me.  He signs it and

6     that's when I produce the pictures.

7     Q    So he first signs saying he understands what's

8     in the form?

9     A    Yes.

10    Q    And then as soon as he signs it, what do you do

11    next?

12    A    I produce the six-pack from behind the form.

13    Q    When you say produce it, do you hand it to him?

14    A    No.  I put it in front of him.  We're sitting

15    at table, just like you and I are now.

16         And I just put the form on there, say, hey,

17    take your time, review the pictures.  If you can ID

18    someone, great; if not, no worries.

19    Q    So describe particularly for me what he did.

20    A    I believe he looked at the pictures, took some

21    time and pointed to the number four.

22    Q    When you say he took sometime, how much time do

23    you recall --

24    A    I don't recall.

25    Q    You don't remember?

                                                    35

**Ron Fernicola & Associates**

1      A      No.

2      Q      Now, other than pointing at four, did he say

3  anything?

4      A      I asked him, who are you pointing at?  He said

5  number four.  I said, who is that?  I asked him, who is

6  that?  He said, that was the individual that put the gun

7  to my face.

8      Q      So the six-pack that you had that was prepared

9  by Detective Fernandez -- let me back up.

10            To your knowledge Detective Fernandez prepared

11  the six-pack based on him having already taken

12  Mr. Slaughter into custody.  Correct?

13      A      Yes.  He was being detained, yes.

14      Q      Did you have an understanding as to why

15  Mr. Slaughter was detained?

16      A      Yes.

17      Q      What was that?

18      A      Based on the Attempt to ID bulletin that we had

19  dispersed to Compton Station.

20      Q      If my question's a little hard to understand,

21  tell me, but, Mr. Slaughter doesn't necessarily look that

22  different.  Do you have any understanding as to why he

23  got picked up?

24      A      No, I just know that the unit that detained him

25  said, hey, I saw a bulletin.  He resembled the person on

36

1        A        Just the training I get as a new detective,

2    yes.

3        Q        When was that training?

4        A        Shortly after August when I got there.

5        Q        So it was within months of your having done

6    this show-up?

7        A        Yes.

8        Q        Is this one of the first show-ups you've done?

9        A        I would say no, I've done show ups before,

10   prior to that.

11       Q        Can you estimate how many?

12       A        Maybe five to ten show-ups.

13       Q        Did you learn anything concerning cross-racial

14   identification?

15       A        Can you elaborate on that?

16       Q        A person of one race identifying a person of a

17   different race?

18       A        Well, wait.  Well, victim identified another

19   victim or two?

20       Q        In other words, let's say you have a Caucasian

21   victim and he's looking at a six-pack of Latinos, or you

22   have a Latino looking at a six-pack of African-Americans.

23       A        Did I?

24       Q        Did you receive any training about, that's

25   called cross-racial identification.

                                                                38

**Ron Fernicola & Associates**

1            Did you receive any training about that?

2     A    No.

3     Q    Now in your discussion with Mr. Ramirez, did

4 you say anything to him about how it is that there might

5 have been a picture of the potential suspect in the case?

6     A    As far as?

7     Q    I'll restate it.

8     A    Yes, I don't understand the question.

9     Q    That's fine.  If you don't understand just tell

10 me, I'll restate it.  It's probably me, not you.

11            So did you tell him anything as to how these

12 pictures were put together?

13    A    No.

14    Q    Did you tell him anything to suggest that the

15 suspect might be among those pictures?

16    A    No.

17    Q    Other than having him read the form, did you

18 tell him anything about the six-pack?

19    A    No.

20    Q    So once Mr. Ramirez circled the picture four,

21 what was the next thing you did in relation to this

22 investigation?

23    A    I believe I asked him what the individual did

24 in the case.  That was vague when I stated it before.

25            But when he pointed at number four, I don't

39

1    The audio should be the six-packs conducted that day.

2        Q     All three of them?

3        A     I believe so, yes.

4        Q     Thank you.  I couldn't get them open.  We'll

5    get them open.  I'm the old guy who can't open things.

6              So the interview was video recorded.  And

7    Mr. Slaughter denied having any involvement in the

8    robbery.  Correct?

9        A     Correct.

10       Q     Did he say anything during the interview that

11   suggested he might have been involved in the robbery?

12       A     No.

13       Q     Then once you interviewed him, what was the

14   next thing you did in relation to the investigation?

15       A     I authored a search warrant for his residence.

16       MR. ARTAN:  Let me mark something as Exhibit 8.

17             (Whereupon Plaintiff's Exhibit 8 was

18        marked for identification by the reporter and

19        is attached hereto.)

20       Q   BY MR. ARTAN:  So do you recognize Exhibit 8?

21       A     Yes, I do.

22       Q     Is that the search warrant and search warrant

23   affidavit that you authored?

24       A     Yes.

25       Q     Is it the complete affidavit?

46

1      A      Yes.

2      Q      Is there anything in the affidavit about the

3   two witnesses who had misidentified -- I don't want to

4   say misidentified -- who identified someone other than

5   Mr. Slaughter?

6      A      No.

7      Q      Is there some reason you left that out of the

8   search warrant affidavit?

9      A      I don't put in -- if someone misidentifies

10  someone I don't put in the search warrant.  I just put in

11  what's relevant to that suspect and what gives us

12  probable cause to search him, his residence.

13     Q      As an aside, that's not the law, just for

14  future reference.  You're supposed to put in all the

15  evidence that's relevant, but we'll put that aside for

16  the moment.

17            So it was your understanding at the time you

18  prepared this affidavit that you only had to put in

19  inculpatory material in the affidavit.  Is that correct?

20     A      Yes.

21     Q      Did you receive any training that suggested to

22  you that you should also put in exculpatory information

23  in the affidavit?

24     A      No.

25     Q      And this training in regards to preparing a

47

```
1    search warrant affidavit, was that at the academy or

2    detective training or something different?

3         A    No, something different.  It's a search warrant

4    class we attend.

5         Q    Is that a P.O.S.T. class?

6         A    I believe so.

7         Q    So the search warrant was issued.  Correct?

8         A    Correct.

9         Q    Is that Melissa Witherfield, the judge?

10        A    I believe so.

11        Q    So if I'm understanding, once you did -- let me

12   back up here.

13             So the six-pack show-ups were done on

14   November 30th.  And you got the search warrant, the

15   search warrant was issued on December 3rd.  Correct?

16        A    Yes.

17        Q    Was it issued the same day you took it in?

18        A    Yes.

19        Q    So once you got the search warrant, what did

20   you do next in relation with the case?

21        A    I conducted a search warrant.  I searched the

22   residence.

23        Q    So at that point was Mr. Slaughter still in

24   custody?

25        A    Yes.
```

                                                                    48

1    of the actual flames went to the length -- to where it's

2    exposed.  That's what we determined.  We also determined

3    he could have -- I mean, it's common people cover up

4    their tattoos with makeup and things like that, so that's

5    what we determined.

6         Q    When did that become an issue?

7         A    I think we discussed it after the interview.  I

8    discussed it with Detective Fernandez, I believe.

9         Q    And so part of your discussion was it could

10   have been covered up with makeup?

11        A    Yes, it could have been covered with makeup or

12   part of the fact -- depending how high the sleeve is, I

13   don't know if it was exposed where you could have seen

14   it, the tattoo.

15        Q    Did you make any notation of that in any of

16   your reports?

17        A    No.

18        Q    Is there any discussion concerning the tattoos

19   in any of your reports?

20        A    No.

21        Q    And just going back to that discussion you had

22   with Detective Fernandez.

23             You said it was after your interview of

24   Mr. Slaughter, was it right after or sometime after?

25        A    No.  It would have been, like, right after the

                                                              62

1    interview with him.

2        Q    What caused you to mention that, because you

3    saw tattoos?

4        A    Yes, because I think we did see tattoos on his

5    person.

6        Q    Did you do anything in terms of going to a

7    criminalist or a forensic --

8        A    No.

9        Q    -- to get some break down?

10       A    No, I didn't.

11       MR. ARTAN:  Let me show you what I've marked as 19.

12   See if you recognize that.

13            (Whereupon Plaintiff's Exhibit 19 was

14       marked for identification by the reporter and

15       is attached hereto.)

16       THE WITNESS:  Yes, I recognize it.

17       Q    BY MR. ARTAN:  Would you agree with me that it

18   is the ID six-pack photo array form that Detective

19   Fernandez conducted?

20       A    Yes.

21       Q    And in this one the witness was Victor Corona.

22            Correct?

23       A    Correct.

24       Q    In this case, Mr. Corona picked out photo four,

25   but the photo four was a different photo four than the

                                                          63

```
 1        MR. PARKER:  No further questions.

 2        MR. ARTAN:  I have a few based on your questions.

 3

 4                    FURTHER EXAMINATION

 5   BY MR. ARTAN:

 6        Q    Just to confirm, there's nothing in any of the

 7   report materials suggesting that you or Detective

 8   Fernandez did anything in relation to the tattoos.

 9             Correct?

10        A    Correct.

11        Q    And there's nothing in your search warrant

12   affidavit concerning the tattoos.  Correct?

13        A    Correct.

14        Q    And you mentioned that you did not think that

15   the ID's by either Mr. Corona or Mr. Lopez were

16   exculpatory.  Correct?

17        A    Correct.

18        Q    Now, looking at Exhibit 19.  At the bottom of

19   Exhibit 19, and this is Mr. Corona's statement.

20             He states:

21             Number four suspect resembles a lot like

22        the armed robber who pointed a gun in my face.

23        He stands out a lot from the rest in my mind.

24             Correct?

25        A    Correct.
```

                                                              70

**Ron Fernicola & Associates**

```
 1        Q    So the way Mr. Corona described what happened

 2   is basically similar to what Mr. Ramirez described in the

 3   sense that he says he had a gun in his face.  Correct?

 4        A    Correct.

 5        Q    And Mr. Caruso picked out someone different

 6   than Mr. Slaughter.  Correct?

 7        A    Corona.

 8             (Off the record 11:51 a.m. to 11:51 a.m.)

 9        Q    BY MR. ARTAN:  So Mr. Corona picked out someone

10   other than Mr. Slaughter saying that that person

11   resembled the armed robber.  Correct?

12        A    Correct.

13        Q    And in the six-pack that Mr. Corona saw,

14   Mr. Slaughter was in that six-pack.  Correct?

15        A    Correct.

16        Q    You're saying that's not exculpatory?

17        A    In the sense, no.  I feel that Victim Ramirez

18   dealt with the suspect for most of the part of the time.

19             The victim followed Mr. Ramirez and he stood

20   like, say, within inches.  He did deal with Mr. Corona at

21   one point and he pointed a gun.  So that's why I felt it

22   was not exculpatory.

23        Q    In your mind what does exculpatory mean?

24        A    That it's 100 percent proved that he's not the

25   victim.
```

                                                            71

1  Q It doesn't mean that, just so you know.

2  A Okay.  So can you clarify?

3  Q It means something that tends to show

4 innocence.  It doesn't mean it has to show innocence by

5 100 percent.  Okay?

6  A Okay.

7  Q So using the actual word exculpatory in mind

8 where it tends to show innocence, do you agree that

9 Mr. Corona's statement is exculpatory?

10  A I think it could be, yes.

11  MR. ARTAN:  Okay.  Thank you.

12   Anything else?

13  MR. PARKER:  Sure.

14

15     FURTHER EXAMINATION

16 BY MR. PARKER:

17  Q Just so I can be clear, Mr. Corona did not

18 identify the individual shown in the six-pack as "four"

19 as the suspect.  Correct?

20  A Correct.  He said he just appeared similar, he

21 resembled him.

22  MR. PARKER:  No further questions.

23  MR. ARTAN:  I'm not going to beat a dead horse.

24   What kind of stip do you want to enter to?

25  MR. PARKER:  I guess I'm so used to going to Code

72

# EXHIBIT  C

1    clicking:  Next page, next page, next page, until you

2    populated all six photographs in the photographic array.

3            It could be a lot.  You could find individuals

4    relatively quickly or you can -- it can take longer where

5    you have to sift through more photographs and more and

6    more and more until you've put together your pool of six

7    individuals.

8        Q    Now in terms of what you did in particular with

9    Mr. Slaughter's six-pack, what criteria did you use to

10   choose the other five photos?

11       A    So I tried to use individuals that look

12   similar.  I noticed that Mr. Slaughter had short hair, it

13   was just all around short.

14            He appears to have a thin mustache there, some

15   facial hair.  Individuals that look to be roughly the

16   same age group.  Just in general similar appearance.

17       Q    Now, did you look at the flyer that's Exhibit 4

18   to help you decide?

19       A    To help me decide the other five?

20       Q    Yes.

21       A    No.  I picked individuals that -- the image

22   that I brought up for Mr. Slaughter, the other five to

23   look similar in appearance to Mr. Slaughter.

24       Q    In terms of how to prepare these six-packs

25   using that program, what kind of training did you receive

                                                      17

1    as far as the program is concerned?

2         A    When I became a detective I was trained by

3    other detectives, basically on-the-job training, if you

4    will; how to use the program, how to compile a six-pack

5    photographic array, and how to do it correctly.

6         Q    Do you remember that you were trained to match

7    the photos to a suspect or if you had a photo of the

8    actual participant to use the participant's photo as a

9    criteria?

10             Do you understand my question?  If you don't

11   I'll try and restate it.

12             Let me start over.

13        A    So...

14        Q    You understand, so go ahead.

15        A    Yes.  I was trained to -- so that the six-pack

16   is not unduly suggestive, you choose individuals of

17   similar appearance to the person that you're originally

18   running the query on.

19             So that, essentially, the six individuals on

20   the photographic array have a similar appearance.

21        Q    So it's kind of unusual to have an actual

22   photo, full-face photo of a perpetrator, I would assume?

23        MR. PARKER:  I'm going to object to the extent it

24   misstates the photo.

25        MR. ARTAN:  Let me put it differently.

                                                        18

1    A    Yes.

2    Q    Do you remember if you had to explain anything

3  to him about the photo lineup or you just gave it to him

4  to read?

5    A    I don't remember.

6    Q    So he picked out number four and it was not

7  Mr. Slaughter.  Correct?

8    A    Is that number seven?  That goes with...

9    Q    You know, I'm not sure.  So I'm just going --

10        Just as far as refreshing your recollection,

11  Detective Sandoval's report says the person Corona picked

12  out was not Mr. Slaughter.

13    A    Okay.

14    Q    Do you independently remember one way or the

15  other?

16    A    I don't.

17    Q    So then other than that involvement you had

18  with Mr. Corona and the six-pack, what, if anything, more

19  did you do in relation to this case?

20    A    We reviewed the surveillance video of the

21  incident.  I remember there was a discussion that was had

22  about the presence or absence of a tattoo.

23        And we couldn't -- we couldn't tell if -- so

24  the surveillance video depicts one of the suspects

25  pointing a handgun at the victim, who I believe was off

                                                    24

1    screen.

2         And the robbery suspect was wearing a -- like a

3    windbreaker-type coat and his wrist was partially

4    exposed.  And I remember Mr. Slaughter had a tattoo, I

5    believe on the inside of his wrist, somewhere on his --

6    the lower portion of his forearm close to his wrist.

7         And in reviewing the surveillance footage we

8    couldn't -- number one, we couldn't tell positively if

9    there was a tattoo there or not or if the sleeve was high

10   enough where, if the true and correct suspect would have

11   been Mr. Slaughter if that sleeve rose up high enough to

12   expose the tattoo that Mr. Slaughter had.

13        And a lot of times, too, I know from my own

14   experience in reviewing surveillance footage, there's

15   different quality surveillance images.

16        Sometimes you find yourself looking at a

17   surveillance video, and, is that a tattoo?  You can't

18   really tell.  Sometimes the images are pixilated on

19   certain frames or lighting.

20        But what I do remember is there was a

21   discussion as to it not being -- because we conduct

22   thorough investigations and we don't want to send

23   somebody to jail that isn't the actual suspect if we can

24   determine that through the course of our investigation.

25        So I remember there was a discussion as far as

                                                        25

1  that tattoo.  But I think, had it been the other way

2  around where we can positively say that the person on the

3  surveillance image definitely had a tattoo there, and

4  then we turn around and look at Mr. Slaughter and he

5  doesn't have a tattoo; so if things were kind of

6  reversed, I think that would be a stronger case in

7  exonerating Mr. Slaughter.

8           In what we reviewed we weren't really able to

9  tell.  In some of the frames it's like, is that a tattoo?

10 And then -- I mean, with the movement and was the sleeve

11 high enough to expose it?  We couldn't really tell

12 conclusively.

13     Q    Let me ask you a few questions about that.

14          This discussion about the tattoo occurred when?

15     A    I don't remember if it was before the photo

16 arrays or after the photo arrays.  It was sometime during

17 the course of that night that that discussion happened.

18     MR. ARTAN:  So let me just show you -- well, if you

19 can be shown Exhibit 18.

20          (Whereupon Plaintiff's Exhibit 18 was

21          marked for identification by the reporter and

22          is attached hereto.)

23     Q    BY MR. ARTAN:  That's one of the stills from the

24 robbery.  Correct?

25     A    Right.

26

# EXHIBIT  D

| | | |
|---|---|---|
| 15:02:19 | 1 | being called to the stand during your hearing? |
| 15:02:24 | 2 | A     No. |
| 15:02:35 | 3 | Q     What -- so there was no preliminary hearing |
| 15:02:38 | 4 | and, then -- well, at a certain point what happened |
| 15:02:42 | 5 | with the case? |
| 15:02:48 | 6 | How did it end? |
| 15:02:49 | 7 | A     My lawyer contacted the head DA of the |
| 15:02:53 | 8 | Compton court building.  The DA in the court |
| 15:02:58 | 9 | building was playing hardball with us acting like he |
| 15:03:02 | 10 | could see the facts, so he went to the higher power |
| 15:03:05 | 11 | and presented the information with the higher power |
| 15:03:09 | 12 | and she -- eventually after he had the appointment |
| 15:03:13 | 13 | with her, she got me pulled to court the next day |
| 15:03:20 | 14 | and -- from the appointment. |
| 15:03:25 | 15 | So I went to court the next day and |
| 15:03:27 | 16 | basically she said that if everything that he showed |
| 15:03:31 | 17 | her was true, then she was going to let me out. |
| 15:03:38 | 18 | So the next day I went to court, and she -- |
| 15:03:41 | 19 | she called me up, she asked to see my arms.  I held |
| 15:03:49 | 20 | out both of my arms to her.  She told me that, "Let |
| 15:03:52 | 21 | me see the inside of the right one."  I showed her |
| 15:03:55 | 22 | the inside of the right one. |
| 15:03:58 | 23 | She told me to turn around.  She told me to |
| 15:04:01 | 24 | turn around.  She said, "Let me see your neck." |
| 15:04:07 | 25 | I showed her my neck, and she told me |

| | | |
|---|---|---|
| 15:04:10 | 1 | immediately, "You got the wrong guy." |
| 15:04:13 | 2 | And I said, "I've been trying to tell you |
| 15:04:13 | 3 | all that since I've been here." |
| 15:04:13 | 4 | And she said, "We'll get it taken care of |
| 15:04:16 | 5 | right now." |
| 15:04:22 | 6 | I was just telling her thank you and |
| 15:04:26 | 7 | thanking my lawyer basically, that she was going to |
| 15:04:29 | 8 | get it figured out. |
| 15:04:31 | 9 | Q    The district attorney that you were dealing |
| 15:04:33 | 10 | with, she was female? |
| 15:04:34 | 11 | A    Yes. |
| 15:04:35 | 12 | Q    Do you remember her name? |
| 15:04:36 | 13 | A    No. |
| 15:04:41 | 14 | Q    All right.  Do you remember the name of |
| 15:04:42 | 15 | your attorney that was helping -- or meeting with |
| 15:04:46 | 16 | the head deputy? |
| 15:04:52 | 17 | MR. ARTAN:  Let me just tell you it was |
| 15:04:54 | 18 | Mr. Rodriguez's firm.  It was one of the associates, |
| 15:04:59 | 19 | Eddie Damas. |
| 15:05:05 | 20 | THE WITNESS:  Eddie Damas. |
| 15:05:07 | 21 | MR. ARTAN:  D-a-m-a-s. |
| 15:05:17 | 22 | BY MR. PARKER: |
| 15:05:17 | 23 | Q    So the district attorney looked at your |
| 15:05:19 | 24 | right arm, wrist, and the back of your neck? |
| 15:05:22 | 25 | A    Yes.  She told me to put my hands up.  She |